# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| **v.** | : | **Criminal Action No. 07-142 (RMU)** |
| | : | |
| **BRENDA BELTON** | : | |

## GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum.

## INTRODUCTION

As she appears before the Court for sentencing, Dr. Brenda Belton is at the confluence of three important ideas.

First, the Law reserves some of its most severe penalties for those who harm children and other vulnerable members of society.  Those punishments reflect our moral outrage over the perniciousness of such conduct and our estimate of the need to deter others from committing such offenses.

Second, education is vital to the health of our democracy and to the opportunity and livelihood of our citizens.  Thus, the Supreme Court has recognized:

> "[Education is not] merely some governmental 'benefit' indistinguishable from other forms of social welfare legislation. Both the importance of education in maintaining our basic institutions, and <u>the lasting impact of its deprivation on the life of the child</u>, mark the distinction.  * * *  We have recognized 'the public schools as a most vital civic institution for the preservation of a democratic system of government,' and as the primary vehicle for transmitting 'the values on which our society rests.'  * * *  In addition, <u>education provides the basic tools by which individuals might lead economically productive lives to the benefit of us all</u>. In sum, education has a fundamental role in maintaining the fabric of our society. <u>We cannot ignore the significant social costs borne by our Nation when select groups are denied the means to absorb the values and skills upon which our social order rests</u>."

Plyler v. Doe, 457 U.S. 202, 221 (1982) (emphasis added) (citations and quotation marks omitted); see also Martinez v. Bynum, 461 U.S. 321, 346 (1983) (Marshall, J., dissenting) ("The fundamental importance of education is reflected in the unique status accorded public education by our society, and by the close relationship between education and some of our most basic constitutional values.").

Third, like a worm in a rotten apple, public corruption eats away at the core of our faith in government. The public has the right to expect that "taxpayer dollars * * * are in fact spent for the general welfare, and not frittered away in graft or on projects undermined when funds are siphoned off or corrupt public officers are derelict about demanding value for dollars." Sabri v. United States, 541 U.S. 600, 605 (2004). Public servants who use their office for private gain, not public good, take more than just their corrupt spoils and hurt more than just the intended beneficiaries of the programs they administer. They take what does not belong to them—the public's resources and trust—and leave behind a legacy of cynicism and distrust.

Dr. Belton was given the honors and privileges of public office and the comforts of a good salary with benefits. Her advanced degrees professed to the world her purported dedication to education. Yet she stole educational opportunities from young, predominantly African-American boys and girls, the vast majority of whom were at the bottom of the socioeconomic ladder. She stole from these vulnerable children so she, her family, and her friends could enjoy the trappings of wealth and conspicuous consumption. She stole the precious trust of parents, students, citizens, and former colleagues.

Dr. Belton must be punished severely. That is what justice requires for her as an individual; and that is what is necessary to deter others from taking her corrupt and selfish path.

-2-

**GOVERNMENT'S POSITION ON SENTENCING**

**I.     Dr. Belton's Scheme**

A.  <u>Charter School Oversight and Funding</u>

The No Child Left Behind Act was created to close the achievement gap between disadvantaged and minority students and their peers.  The NCLB sought to strengthen Title I of the Elementary and Secondary Education Act of 1965 by requiring states to implement statewide accountability systems covering all public schools and students.  These systems are based on challenging state standards in reading and mathematics, annual testing for all students in grades 3 through 8, and annual statewide progress objectives ensuring that all groups of students reach proficiency within 12 years.  The District of Columbia uses NCLB funds to meet NCLB goals.

The D.C. School Reform Act of 1995, as amended, identifies two eligible chartering authorities:  the D.C. Board of Education (BOE) and the Public Charter School Board (PCSB).  The BOE Charter Schools are run out of the Office of Charter School Oversight.  For the 2005/2006 school year, OCSO supervised 17 charter schools and PCSB supervised 34 charter schools.

One of the duties of the OCSO is to monitor the BOE charter schools.  Charter school monitoring is a required annual evaluation for all D.C. charter schools.  It involves examining all aspects of a charter school, including but not limited to:  teaching; student achievement; financial management; governance; compliance with D.C. School Reform Act; and parental involvement.

On or about March 1, 2003, Dr. Belton became the Executive Director, Compliance Division, of OSCO.  The OCSO and its programs were funded by the District, the federal government through the NCLB, and by a Central Investment Fund (CIF).  The CIF consisted of

one percent of the annual budgets of each of the BOE charter schools.  Money left in the CIF

belonged to the OCSO and did not have to be returned to the District at the end of the fiscal year.

During the 2003/2004 school year, NCLB gave OCSO and PCSB $1.9 million in

appropriations to assist charter schools comply with NCLB.  The money had to be spent by

October 1, 2004.  For the 2004/2005 school year, NCLB gave OCSO and PCSB $850,000 in

NCLB appropriations.

B.  Thefts, No-Bid Contracts, and Kickbacks

Dr. Belton used her official position as the Executive Director responsible for BOE

charter school oversight to benefit herself, her family, and her friends.  In doing so, she was the

leader and organizer of a large group of people who owed their salaries and contracts to her and,

in return, paid her kickbacks.

1.  *Count One*

DCPS  monitors all aspect of charter schools, including teaching, student achievement,

financial management, governance, compliance with the D.C. School Reform Act, and parental

involvement.  DCPS pays outside contractors to conduct this monitoring function, and the

average contract during the relevant time period was approximately $60,000 annually.

Dr. Belton's company, BHX, received $63,000 pursuant to a contract to monitor charter

schools for the 2001-02 school year.

In March 2003, Dr. Belton became the Executive Director of the Office of Charter

School Oversight.  In May 2003, Dr. Belton awarded the 2002-03 monitoring contract to a

company, EAI, controlled by two of her long-time friends.  That was the first contract ever

received by that company and the only time EAI made money.  Five companies had submitted

bids to the government to obtain that contract. Dr. Belton chose the members of the review panel that was charged with reviewing the bids. But even though she hand-picked the committee members, and put her maid of honor on the committee, Dr. Belton did not have the committee meet; instead she awarded the contract to her two friends' company, EAI, simply by giving it a 54-point addition over the scores of other bidders. Dr. Belton gave her friends a one-year contract with four option years, each of which would have required approval from the Board of Education.

As often happens when public contracts are awarded on the basis of friendship rather than merit, the critically important work of monitoring public charter schools was left in the hands of people who did not perform the work satisfactorily. But instead of putting the monitoring contracts out for bid in future years, Dr. Belton ignored contracting rules and used EAI's name to subcontract the work to others.

For the 2004-05 school year monitoring contract, Dr. Belton created a fictitious company, EAIE, and used the Employer Identification Number of EAI. She thus submitted invoices for monitoring in the name of EAIE.

For the 2005-06 school year monitoring contract, Dr. Belton again did not put out the monitoring contract for bid. She continued to use EAIE.

In 2005, however, Dr. Belton began to defraud the government in even more base and crass ways. Between April 2005 and May 2006, she submitted nine false and fraudulent invoices for monitoring payments purportedly owed to EAIE. As a result, EAIE, which in reality was Dr. Belton, received over $200,000 to which it was not entitled and for which no monitoring work was done. That money was simply stolen by Dr. Belton and is reflected in the following chart:

| Date | Payor | Payee | Account Name | Amount |
|---|---|---|---|---|
| April 2005 | DCPS | E.A.I.E. | BHX Consulting | 25,747.00 |
| April 2005 | BELTON | | S.F. | -18,747.00 |
| May 2005 | DCPS | E.A.I.E. | BHX Consulting | 30.949.00 |
| May 2005 | BELTON | | S.F. | -18,949.00 |
| June 2005 | BELTON | | S.F. | -19,246.20 |
| June 2005 | DCPS | E.A.I.E. | BHX Consulting | 22,446.20 |
| July 2005 | BELTON | | S.F. | -15,670 |
| July 2005 | DCPS | E.A.I.E. | BHX Consulting | 29,617.00 |
| July 2005 | DC-PCSB | E.A.I.E. | BHX Consulting | 43,000.00 |
| September 2005 | DC-PCSB | E.A.I.E. | BHX Consulting | 76,250.00 |
| February 2006 | DCPS | E.A.I.E. | BHX Consulting | 9,828.00 |
| February 2006 | DCPS | E.A.I.E. | BHX Consulting | 22,786.20 |
| May 2006 | DCPS | E.A.I.E. | BHX Consulting | 15,427.00 |
| | | | **TOTAL** | **$203,438.40** |

2.  *Count Two*

In addition to the more than $200,000 Dr. Belton stole by using a sham company, EAIE, Dr. Belton obtained nearly $200,000 in additional corrupt funds by (a) stealing from the government by using other companies and forging checks, and (b) demanding and receiving kickbacks from her friends for contracts or jobs she steered to them.

A.    Thefts

Dr. Belton obtained over $60,000 by fraudulently submitting invoices in various company names, forging the signatures of the payees, and depositing the money into her personal accounts.     Thus, she submitted three false and fraudulent invoices in the name of one company:  $5,700, in September 2004; $4,384.65, in March 2005; and $4,143.40, in July 2005.

She submitted one false and fraudulent invoice in March 2005 for $6,300 for a second company.

Finally, she submitted one false and fraudulent invoice in November 2005 for a third company in

the amount of $43,750.

### B.    No-Bid Contracts & Kickbacks

A large portion of the money Dr. Belton received corruptly came from kickbacks paid to

her from other participants in her scheme.  These kickbacks were paid to Dr. Belton because she

was using her official position to steer jobs and no-bid contracts to friends and relatives who, in

return, were giving her a share of the proceeds.  Dr. Belton had no contracting authority, and, to

compound that problem, she violated contracting procedures by awarding no-bid contracts

primarily benefitting friends and relatives even though all contracts over $10,000 are required to

be put out for competitive bids.  In total, Dr. Belton corruptly used her position to obligate the

government with respect to seven no-bid contracts totaling $444,620.99.

### i.    Participants One and Two

As noted above, Dr. Belton bypassed contracting procedures to award two of her long-

term friends the 2002-03 charter school monitoring contract.  That contract, to EAI, was the first

time EAI made money, and the work Dr. Belton's friends did in monitoring charter schools to

ensure they were providing high quality education to their students was so unsatisfactory that

they did not do monitoring work again.  In return for the $65,000 in D.C. funds they received

under the contract, Dr. Belton's friends paid her nearly $25,000 in kickbacks.[1]  Participants One

---

[1]    Dr. Belton's friends paid her the kickbacks through three funding sources they
controlled:  EAI, a bookstore, and a charter school.  Thus, EAI gave Belton five checks between
June 2003 and July 2004 totaling $12,300; the bookstore gave Belton six checks between July
2003 and August 2003 totaling $9,966.80; and the charter school gave Belton one check in
August 2003 for $3,000.

and Two were paid for the work they had done, albeit poorly, whereas Dr. Belton received more than 38 percent of the contract in kickbacks—i.e., a larger share than either Participant One or Participant Two received individually—just by virtue of her official position.

### ii.    Participant Three

A third participant agreed to pay Belton kickbacks for her assistance in placing the charter school run by Participants One and Two into a building owned by participant Three. Thus, Dr. Belton received $5,000 for every month in which the charter school paid the rent it owed.  As a result, Dr. Belton received six checks through Participant Three totaling $50,000 in kickbacks between July 2004 and November 2005.

### iii.    Participant Four

A fourth participant in Dr. Belton's scheme received $41,581 in consulting work from the Office of Charter School Oversight.  In return, Participant Four paid Dr. Belton $7,500 in kickbacks through three payments between October 2004 and March 2005.

### iv.    Participant Five

A fifth participant in Dr. Belton's scheme was hired as the Charter School Liaison for the Board of Education, a position in which she was reporting to and supervised by Dr. Belton, who hired her.  Participant Six received over $70,000 in compensation, and $3,733 in consulting fees, even though she only worked a few months.  In return, Participant Five paid Dr. Belton over $27,000 in kickbacks through 32 payments between December 2004 and June 2006.

### v.    Participant Six

A sixth participant received multiple consulting jobs paid for by public funds and paid Dr. Belton one kickback in the amount of $2,000 in May 2005.

vi.     Participant Seven

Dr. Belton directed the Seventh Participant, a childhood friend, to assist her in attempting to avoid detection of the scheme by signing a back-dated "agreement" purportedly between Dr. Belton's sham company, EAIE, and a consulting service. Statement of Offense at 10, ¶ 46. Participant Seven, at Dr. Belton's direction, misrepresented that she had been the president of EAIE since at least December 14, 2004, even though she had never worked for or been paid by the sham company. Id.

The additional funds received by Dr. Belton through theft or kickbacks are shown in the following chart:

| Date | Payor | Payee | Account Name | Amount |
|------|-------|-------|--------------|--------|
| Jun 03 | E.A.I. | Dorris Norris | Brenda Belton | 2,000.00 |
| Jul 03 | E.A.I. | Dorris Norris | BHX Consulting | 2,000.00 |
| Jul 03 | N.V.B. | A.1 A. | BHX Consulting | 1,200.00 |
| Jul 03 | N.V.B. | BHX Consulting | BHX Consulting | 578.00 |
| Jul 03 | N.V.B. | A.1 A. | A.1 A. | 1,500.00 |
| Jul 03 | N.V.B. | A.1 A. | A.1 A. | 1,500.00 |
| Jul 03 | N.V.B. | A.1 A. | A.1 A. | 1,500.00 |
| Aug 03 | N.V.B. | A.1 A. | A.1 A. | 3,382.80 |
| Aug 03 | Y.A.W. | Brenda Belton | BHX Consulting | 3,000.00 |
| Oct 03 | E.A.I. | Brenda Belton | BHX Consulting | 3,000.00 |
| Dec 03 | E.A.I. | Brenda Belton | Brenda Belton | 300.00 |
| Jul 04 | E.A.I. | Brenda Belton | BHX Consulting | 5,000.00 |
| Jul 04 | C.P./D.S. | T.T.G. | T.T.G. | 5,000.00 |
| Aug 04 | C.P./D.S. | T.T.G. | T.T.G. | 5,000.00 |
| Aug 04 | C.P./D.S. | T.T.G. | T.T.G. | 5,000.00 |

| Sep 04 | DCPS | Habari Gani | T.T.G. | 5,700.00 |
|---|---|---|---|---|
| Oct 04 | L.S. | T.T.G. | T.T.G. | 3,000.00 |
| Nov 04 | C.P./D.S. | T.T.G. | T.T.G. | 10,000.00 |
| Dec 04 | P.S. | L.H. | L.H. | 3,000.00 |
| Jan 05 | L.S. | Brenda Belton | BHX Consulting | 1,500.00 |
| Jan 05 | P.S. | L.H. | L.H. | 782.00 |
| Jan 05 | P.S. | L.H. | L.H. | 785.00 |
| Feb 05 | P.S. | L.H. | L.H. | 785.00 |
| Feb 05 | P.S. | L.H. | L.H. | 785.00 |
| Feb 05 | L.S. | Brenda Belton | BHX Consulting | 3,000.00 |
| Mar 05 | P.S. | L.H. | L.H. | 800.00 |
| Mar 05 | P.S. | L.H. | L.H. | 800.00 |
| Apr 05 | P.S. | L.H. | L.H. | 800.00 |
| Mar 05 | DCPS | Habari Gani | BHX Consulting | 3,384.65 |
| Mar 05 | DCPS | H. S.-R. | T.T.G. | 6,300.00 |
| Apr 05 | P.S. | L.H. | L.H. | 800.00 |
| May 05 | P.S. | L.H. | L.H. | 800.00 |
| May 05 | P.S. | L.H. | L.H. | 800.00 |
| May 05 | W.G. | Brenda Belton | Brenda Belton | 2,000.00 |
| Jun 05 | P.S. | L.H. | L.H. | 800.00 |
| Jul 05 | C.P./D.S. | T.T.G. | T.T.G. | 15,000.00 |
| Jul 05 | P.S. | L.H. | L.H. | 800.00 |
| Jul 05 | P.S. | L.H. | L.H. | 800.00 |
| Jul 05 | DCPS | Habari Gani | BHX Consulting | 4,143.40 |
| Aug 05 | P.S. | L.H. | L.H. | 800.00 |
| Sep 05 | P.S. | L.H. | L.H. | 800.00 |
| Oct 05 | P.S. | L.H. | L.H. | 800.00 |
| Oct 05 | P.S. | L.H. | L.H. | 800.00 |

| Oct 05 | V.P. | T.T.G. | T.T.G. | 5,000.00 |
|--------|------|--------|--------|----------|
| Nov 05 | C.P./D.S. | T.T.G. | T.T.G. | 10,000.00 |
| Nov 05 | P.S. | L.H. | L.H. | 800.00 |
| Nov 05 | DC-PCSB | T.Z.G. | T.T.G. | 43,750.00 |
| Dec 05 | P.S. | L.H. | L.H. | 800.00 |
| Dec 05 | P.S. | L.H. | L.H. | 800.00 |
| Dec 05 | P.S. | L.H. | L.H. | 800.00 |
| Jan 06 | P.S. | L.H. | L.H. | 800.00 |
| Feb 06 | P.S. | L.H. | L.H. | 800.00 |
| Mar 06 | P.S. | L.H. | L.H. | 800.00 |
| Mar 06 | P.S. | L.H. | L.H. | 800.00 |
| Apr 06 | P.S. | L.H. | L.H. | 800.00 |
| Apr 06 | P.S. | L.H. | L.H. | 800.00 |
| Apr 06 | P.S. | L.H. | L.H. | 800.00 |
| May 06 | P.S. | L.H. | L.H. | 800.00 |
| May 06 | P.S. | L.H. | L.H. | 800.00 |
| Jun 06 | P.S. | L.H. | L.H. | 800.00 |
|  |  |  | **TOTAL** | **180,471.85** |

### 3. Counts Three and Four

While Dr. Belton was being paid her salary as a District of Columbia public official through taxes collected on other District of Columbia residents, she did not pay taxes on all the income she earned in 2004 and 2005, even though she, too, was a resident of the District of Columbia.  Moreover, she failed to pay the taxes due and owing to the federal government on the full amounts of taxable income she received in 2002, 2003, 2004, and 2005.

-11-

**II.     Dr. Belton's Conduct Harmed Children**

Deputy Mayor Victor Reinoso's victim impact statement on behalf of the District of Columbia's citizens speaks powerfully and eloquently on the harm done to the vulnerable students in the charter schools Dr. Belton was supposed to be overseeing.  Deputy Mayor Reinoso states that "[m]ore than 87 percent of the students in these * * * charter schools were African American and fully three quarters qualified for free or reduced [fee] school lunch."

In most cases, and certainly in this one, public funding presents a zero-sum problem: funds spent on one project are not available to be spent on another.  Thus, every single dollar Dr. Belton spent on herself, her family, and her friends was a missed opportunity to spend that money to hire additional teachers or to pay for additional teacher training, additional course materials, or any other program or project, the scope of which would only have been limited by the imagination of teachers and principals.  They could not dream of such additional pedagogical benefits for their students, however; for, it appears they did not even know about the pot of public money Dr. Belton was using as a personal bank account.

This matters so much, and is so tragic here, because the needs of the children in Dr. Belton's charter schools were and are so overwhelming.  To pick up the words of the statute, Dr. Belton placed these children at further risk of being left behind.  The test records for these schools shows the obvious needs of the students and thus the obvious benefits that might have accrued if the funds misdirected to Dr. Belton directly (or misspent on no-bid contracts to friends and family members with dubious qualifications and skills) had been spent on high quality educational efforts and assessments.

-12-

The following chart shows, for some of the public charter schools under Dr. Belton's watch, the number of students enrolled in 2006, and the percentage of students who were below proficient level in reading and math[2]:

| School | 2006 Enrollment | Percentage of Students Below Proficient In Reading (top) and Mathematics (bottom) | | | |
|---|---|---|---|---|---|
| | | 2003 | 2004 | 2005 | 2006 |
| Barbara Jordan Public Charter School | 107 | 59 59 | 70 71 | 70 66 | 77 86 |
| Booker T. Washington Public Charter School for Technical Arts | 293 | 90 90 | 93 86 | 90 75 | 70 85 |
| Children's Studio School | 82 | 50 50 | 56 76 | not available | not available |
| Community Academy: Benjamin & Gladys Amos Elementary Campus | 333 | 57 57 | 51 52 | 29 39 | 58 68 |
| Elise Whitlow Stokes Community Freedom Public Charter School | 250 | 54 54 | 62 54 | 46 33 | 52 62 |
| Hyde Leadership Elementary Public Charter School | 760 | 66 66 | 66 62 | 54 57 | 59 72 |
| Ideal Academy | 328 | 65 66 | 55 57 | 40 44 | 63 77 |
| Integrated Design and Electronics (IDEA) Academy Public Charter School | 409 | 72 72 | 68 63 | 60 70 | 76 73 |

---

[2]    Test scores from these schools were derived from the D.C. Public Schools's web site, at http://dcschoolsearch.dc.gov/schools/school_listing.asp?keyword=&facility_name=&school_type=33&school_level=&ward=.

| Kamit Institute for Magnificent Achievers Public Charter School | 202 | 71 71 | 66 59 | 73 69 | 61 65 |
|---|---|---|---|---|---|
| Options Public Charter School | 237 | 73 73 | 72 75 | 76 85 | 82 88 |
| Roots Public Charter School | 111 | 40 40 | 27 27 | not available | not available |
| Washington Academy Public Charter School Castle Campus | 176 | | | | 84 95 |
| Young America Works Public Charter School | 221 | | | | 83 86 |

These numbers are heartbreaking for anyone who cares about children, and they look even worse when examined individually:

• **90 percent** of the nearly 300 students at **Booker T. Washington** Public Charter School were **below proficient in reading** in 2005, one of the years in which Dr. Belton stole the bulk of her money;

• **86 percent** of the more than 200 students at **Young America Works**, the school run by Participants One and Two in Dr. Belton's scheme, were **below proficient in mathematics** in 2006;

• **85 percent** of the more than 200 students whose parents chose the **Options** Public Charter School were **below proficient in mathematics** in 2005; and

• **73 percent** of the roughly 200 students at the **Kamit Institute for Magnificent Achievers** Public Charter School were **below proficient in reading** in 2005.

-14-

What might have been done differently, if Dr. Belton had not siphoned off public funds meant for the children at these schools?  As Deputy Mayor Reinoso stated in the District of Columbia's victim impact statement:

> "the charter schools could have hired 17 additional teachers or specialists for the year. They could have purchased an additional 17,000 textbooks or instructional DVDs for the students. They could have paid for thousands of hours of professional development for teachers."

Under the circumstances, there can be no doubt that each and every child at one of Dr. Belton's public charter schools was directly harmed by her corruption.

**III.    Dr. Belton Deserves a Significant Punishment Under the Guidelines.**

The parties have agreed almost entirely on the calculations under the United States Sentencing Guidelines.  Indeed, Dr. Belton stipulated that her Guideline Offense Level is a 17 if the Court does not find her to be a leader or organizer and a 19 if it does find her to be a leader or organizer.[3]

The government respectfully submits that Dr. Belton should receive a two-level enhancement under Section 3B.1.1(c) of the United States Sentencing Guidelines based on her role as an "organizer, leader, manager, or supervisor" or criminal activity.  Application Note Four to this provision provides that courts should consider

---

[3]    The United States Probation Office arrived at a Guidelines Level of 21 based on its grouping calculation.  The plea agreement provides that "[i]n the event that the Court considers any Guidelines adjustments, departures, or calculations different from any stipulations contained in this Agreement * * * the parties reserve the right to answer any related inquiries from the Court."

"the exercise of decision making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of illegal activity, and the degree of control and authority exercised over others."

U.S.S.G. § 3B1.1, App. Note 4.

As shown above, Dr. Belton was the leader and organizer of a scheme involving at least seven participants.  As Executive Director of the Office of Charter School Oversight, she had the decision making authority to implement her scheme and she was "hierarchically superior" to the other participants.  See United States v. Quigley, 373 F.3d 133, 140 (D.C. Cir. 2004).   She had "substantial operational authority" and "ma[d]e it work * * *" by putting friends on the contract review panel and circumventing contracting and bid rules to award the contract to Participants One and Two.  See United States v. Bras, 483 F.3d 103, 114 (D.C. Cir. 2007).  She personally directed the scheme, and used her position to reward her friends and family and to demand and accept kickbacks.  She had "superior bargaining power" over the other participants, see United States v. Smith, 374 F.3d 1240, 1249 (D.C. Cir. 2004), in that the other participants were only able to participate and benefit from the scheme because she brought them into the scheme ("recruitment") and used her position for their mutual illicit benefit; if they had objected to paying kickbacks, they were entirely at risk of losing their preferred status in the scheme and with the District of Columbia.  In addition, she directly supervised and managed Participants One, Two, Four, and Five, who were D.C. contractors or employees.  She also directed Participant Seven, a childhood friend, to sign and back-date a false "agreement," in which the friend represented herself as having been the president of Dr. Belton's sham company even though the friend had never worked for the company.  Statement of Offense at 10, ¶ 46.  Finally,

-16-

Dr. Belton received the lion's share of proceeds under the scheme, see <u>United States</u> v. <u>Graham</u>, 162 F.3d 1180, 1184 (D.C. Cir. 1998), in that Participants One and Two provided Dr. Belton with more than one-third of the value of their monitoring contract even though they did all the work and Dr. Belton was only receiving the kickbacks because she had improperly steered the contract to them.

## IV.    Dr. Belton Deserves a Significant Punishment Under Section 3553.

Dr. Belton has specifically waived her right to argue for any other sentence than the one provided under the U.S. Sentencing Guidelines and according to her stipulated guidelines range. Thus she has agreed not to "seek a sentence outside the Stipulated Guidelines Range or suggest that the Court consider a sentence outside the Stipulated Guidelines Range."[4]  The government respectfully submits that the factors under 18 U.S.C. § 3553(a) further support a heavy sentence at the top of the guidelines range.

A.  <u>Nature of the Offense</u>

Dr. Belton did not chose to commit just one crime on one day.  Her scheme involved numerous frauds, kickbacks, and participants over several years, and she chose on a daily basis to continue her corrupt scheme.  She stole from disadvantaged children, whose parents had put them in public charter schools out of some hope that they would get a better education for their children.  She has left a legacy of distrust among her former colleagues and among students, parents, and citizens at large.  Moreover, to hide her scheme, she (1) repeatedly generated fraudulent Memoranda of Understanding between her sham companies, the Office of Charter

---

[4]    During the plea colloquy, the Court specifically asked Dr. Belton about her understanding and agreement to waive her right to seek a sentence outside her guidelines range.

School Oversight, and various vendors, see Statement of Offense at 10, ¶ 45; and (2) had a childhood friend sign and back-date a false "agreement" under which the friend purported to have been the president of Dr. Belton's sham company, EAIE, even though the friend had never worked for EAIE and had never been compensated by EAIE, id, ¶ 46.

In short, Dr. Belton's offense, inasmuch as it sacrificed the opportunities of children seeking a good education, is shocking and offensive and warrants a heavy sentence.

B.  History and Characteristics of the Defendant

Dr. Belton is healthy.  She has no severe continuing physical or mental health issues. She has a strong connection to her faith.

Dr. Belton has the love of family and friends.  She has a very close relationship with her daughter.  Even her ex-husband calls her "brilliant."  And she has long-time friends, not just those named above as Participants.

Dr. Belton is highly educated.  As her title suggests, she has a doctorate in education; she also has a masters degree in mathematics and a bachelors degree in mathematics and business administration.

Dr. Belton, with no minor children or other dependents, had the benefits of a comfortable lifestyle through her legitimate salary as a District of Columbia employee.  As the Executive Director of the Office of Charter School Oversight, Dr. Belton earned an annual salary of approximately $80,000.

Dr. Belton has enjoyed a long and varied professional career.  She has worked as a teacher, an administrator, a consultant, an executive director, and, based on her professional affiliations, apparently as a real estate and travel agent.

In short, Dr. Belton has no inherent reason to justify her outrageous conduct in this case. She has had educational opportunities of which students in her charter schools could only dream. She had a good job. She was loved by friends and family. She did not truly need the hundreds of thousands of dollars she stole, and the money was not going to treat sick children or to feed hungry mouths. She was simply greedy and corrupt. Neither she nor the children in her charter schools has much to show for the roughly $415,000 she incurred in personal expenses during the life of her scheme.

But, even worse, Dr. Belton appears to be unrepentant. Even after pleading guilty, she continues to blame her predicament on others. Thus, she states that "politics in D.C. got to be so hard, no matter what you did it wasn't enough"—as though the problem was external forces, not her greed.[5]

It is also difficult to find a genuine sense of repentance in someone who seeks to justify her conduct by saying that she "felt the need to be a nurturer" and that she did not see her behavior as corrupt at the time. During her scheme she was submitting false and fraudulent invoices in the name of her sham company and putting the illicit proceeds into her personal bank accounts; that part of her scheme netted over $200,000 in stolen funds. She also submitted false invoices in the names of other companies; and, by forging the signatures of the payees, she was able to obtain over $60,000 in additional stolen funds. To cover up her crimes, she generated false memoranda of understanding and agreements on her own and with the assistance of friends.

---

[5]    In truth, there were politics, but of the good kind:  there were some school board members and city council members who pushed Dr. Belton to provide adequate detailed budgets to explain what she was going to do with the funds her department was receiving.  Dr. Belton repeatedly fought those efforts.

Dr. Belton could have had no reasonable doubt at the time about the criminal nature of such conduct.   Moreover, having her friends pay her over $100,000 in kickbacks to obtain contracts and jobs is not "nurturing" or charity.

C.   <u>The Need for the Sentence to Reflect the Seriousness of the Offense</u>

A sentence at the top of the guidelines range would reflect the seriousness of Dr. Belton's crimes and would provide just punishment for her actions.

D.   <u>The Need for the Sentence to Afford Adequate Deterrence</u>

Dr. Belton's ex-husband was perhaps unintentionally revealing when he stated his opinion that, as pertains to Dr. Belton's public corruption-type crimes, "everyone in DC does it." This is exactly the type of mind set that has to be removed from our public officials and our culture at large.   A sentence at the top of the guidelines range would send a powerful, salutary message of deterrence to others who might be tempted to follow Dr. Belton's corrupt path:  if you use your public office for private, illicit gain, you will face sure, swift, and severe punishment

E.   <u>The Need for the Sentence to Provide Educational or Other Benefits</u>

Unlike many of the defendants who appear before the Court, Dr. Belton has no need for the sentence to provide her educational or vocational training.   Dr. Belton has two advanced degrees and a long career.   Nor does the sentence need to provide her medical care or other treatment.[6]

---

[6]    Even though Dr. Belton's scheme was sophisticated and long-lived, there is not a strong basis for imposing a sentence based on the need to protect the public from her in the future, provided that she is not entrusted with an entity's financial instruments.

**CONCLUSION**

The Court should sentence Dr. Belton at the high end of the guideline range, and in accordance with the factors articulated in 18 U.S.C. § 3553(a), to punish her for her conduct and to deter others who might consider using their public office for private gain, not public good.

Respectfully submitted,

JEFFREY A. TAYLOR
UNITED STATES ATTORNEY

By:     _____
        Timothy G. Lynch, D.C. Bar No. 456506
        Assistant United States Attorney
        555 4th Street, NW
        Washington, D.C. 20530
        (202) 353-4862